with the court's permission, I would like to reserve four minutes for rebuttal. Your Honors, I think we can all agree the defendant facing revocation of supervised release, and the corresponding potential loss of liberty, retains certain constitutional rights, including the due process right to testify in his or her defense. Yeah, we can certainly agree to that, so let's dive into what's challenging in this case. Can you help me with the transcript in this? There appears to be reference to a conversation that didn't make it in the transcript. I'm just puzzled by the exchange at pages 280-81 of the appendix. This has gotten some play, of course, in the conversation leading into the courtroom today. Judge Kugler asserts, I asked you, Barksdale, if you wanted to testify, and you said no. Now, you know, you said, no, he did say he didn't want to. Judge Kugler, he's not, he's a smart, capable, experienced judge. I don't think he's hard of hearing, I don't think he's easily confused, he's certainly not dishonest, Mr. Barksdale's got a few convictions for dishonesty, but Judge Kugler's a very respected, honest man, and he says, I asked you if you wanted to testify, you said no. To which your client doesn't say, I never said that, I never said anything like that. He says, no, I said, if we could make a deal, then I would say no, meaning, no, I don't want to testify. Yes, Your Honor, I think that... So what's going on here? He doesn't deny that he indicated he didn't want to testify. Can you explain the record? Well, I think, Your Honor, if you read the transcript thoroughly through, and I agree, the transcript reflects probably a very frustrating experience for most people in the courtroom, given the longevity of the hearing and other things, and Judge Kugler certainly has the right to control his courtroom, but yet, as far as what's put on the record with regard to Mr. Barksdale's assertion of his right to testify, the first mention we have of it is defense counsel stating, my client wants to testify, and then some time goes on, and he says, we've decided he's not going to testify, and Mr. Barksdale immediately speaks up and says, no, no, no, I prefer to testify. Right. When you say, read the record, I've read the transcript. That's why I'm asking you about this. It looks like there's confusion in the record here, because there's a point at which Judge Kugler says, he didn't say, I talked to your lawyer, he said, I asked you if you want to testify, and you said no, and Barksdale's response is, I said, if I had a deal, I wouldn't want to testify. He doesn't say, I never said I wasn't going to testify. What's going on in this record? There was a break in the proceedings, during which, of course, defense counsel and Mr. Barksdale in probation spoke off the record in an attempt to reach some sort of agreement. Prior to that, however, Mr. Barksdale had stated several times, I prefer to testify, I want to testify, contrary to what his lawyer was representing to the court. So there was... Sue, yeah, there's plenty of places where he says he wants to. So let's say we thought he really does want to testify, and that it was error to not let him testify. What's the right standard? Is it Chapman or is it Kodiakos? I think it's clear, Your Honor, with all due respect, that the standard is the Chapman standard, which applies to direct appeals, tests of whether... When there's a violation of constitutional rights, assuming his constitutional rights to testify was violated, and this is on direct appeal, the court needs to apply the harmless beyond a reasonable doubt standard with the government bearing the burden of proving that the error was harmless beyond a reasonable doubt. The Breck standard applied... The Breck decision in itself ruled that Chapman, the Chapman standard, which was... Pardon me, excuse me, the Kodiakos standard, which applies to non-constitutional errors, was the appropriate standard to apply in habeas proceedings or when there's not a direct appeal. And that makes sense and has been reflected in subsequent proceedings. But let's say we thought you were right, it's Chapman, and we ought to say that straight out and make it clear. Assuming we thought Chapman was the standard, that doesn't mean that even constitutional error can never be harmless. It can be harmless. That's the point of Chapman, right? Correct. Okay, so your client says at length things about what he would say if he got on the stand, both before the judge says, okay, we're going to stop for today and we'll take this up with decision and sentencing tomorrow. He has a relatively long colloquy where the judge keeps saying, look, you just can't keep effectively testifying there without... Mr. Barr still keeps talking. And then the next day at the sentencing, he goes on for about 25 pages on the transcript, giving his side of the story with the benefit of not being under cross-examination. What is it that would have been different if he had gotten on the stand and been subject to cross-examination? What would he have said differently than he said at extraordinary length? Well, again, with all due respect, Your Honor, we don't know. It would be speculation to decide, to determine that whatever he had to say would not have swayed the judge, would have been irrelevant. Because the judge himself, on page 351 of the transcript, after he revoked the judge's release... There's no swaying this judge. Are you changing your mind and saying, I shouldn't say you? Mr. Boxdale's assertion is, this can't go back to Judge Kugler. I'd get the same thing. Is the position you're taking that if somebody speaks at extraordinary length and gives their entire story, that the fact that they weren't on the stand under cross-examination means they didn't get the chance to get their story out? I believe there is a constitutional right to testify in your own defense, and I think that's very clear. And I think even though Mr. Boxdale may have been contentious and perhaps even difficult, he still has that constitutional right. And he should have been allowed to take the stand. But you're really saying this, you're saying it's structural error. There's no way that this could not be harmless. I wouldn't go so far. What world could this be harmless in your view? Well, for instance, Your Honor, Judge Kugler found Mr. Boxdale violated, I believe it was nine different conditions of supervisory release. Most of those were technical violations. The two criminal violations, to my knowledge, Mr. Boxdale... Violations or arrests, right? They were arrests, exactly. And I was about to say, he has not been convicted of those. He has not pled guilty. Those are still just allegations. Has that been tried yet? No, it has not. When I last checked, which was just a few days ago, nothing. These were the, what, the 2019 arrests? Correct, Your Honor, the New Jersey state cases. Okay. And so the technical violations, again, perhaps he did have something to... Mr. Boxdale came at it from his perspective, his proof he wanted to provide to the court. Whether or not the court would have accepted that, we can't make that decision now not having heard the evidence. That's what I'm trying to press you on when you say his evidence. Which consists of his testimony. His story. Did he not give that story? Wasn't that the 25 pages of transcript at the hearing the next day before there was a violation declared and a sentence imposed? The transcript reflects that when Mr. Boxdale did address the court, the court would cut him off and state, you can't testify, you can't stand here and talk to me and not be under oath. But whenever he tried to take the stand, he was not permitted that opportunity. And so I think when you have a transcript like this, which is probably very rare, there's no question Mr. Boxdale wanted to take the stand and he was not permitted to do that. I am trying to get you to answer this question, so I'll take one more run at it. How could there have been harmless error here? You've acknowledged that under Chapman there can be harmless error, but you also seem to be arguing that there's nothing that could have substituted for him being seated on the when he was saying the things that he said while he was standing up in the courtroom on two successive days. So if that's your position, help me understand how there could ever be harmless error. Are you really arguing that this is structural? And if you are, what's your support for that? I'm not arguing that it's structural error, Your Honor. I'm arguing that under the record that we have, there's not enough information for the court to determine that it was harmless. And that is because Judge Kugler stated several times he would not consider anything he said unless he was under oath. But he did consider it the next day. He let the guy go on and on, didn't he? Well, he let him go on and on, but did he consider it? He stated the next day, I'm not, you know, this boy is convenient for you now. Now you want to talk to me. Now after you wouldn't take the stand yesterday. OK. I seized much of my colleague. All right. Thank you, Ms. Bronson. May it please the court, John Romano for the United States. I'll start with the clear error point, which is, you know, what was happening at this hearing. And I think, you know, two issues here. I think number one is we need to give Judge Kugler a little bit of deference here. He's a terrific judge. He's been on the court for 30 years. The burden of proof is on the government, isn't it, to show that if there was an error, that the error was harmless, right? Beyond a reasonable doubt? I disagree with that one, Your Honor. I was first addressing the clear error point. They disagree whether it's reasonable doubt or katiakos, et cetera. But ordinarily, if there is an error, the government has to show it's harmless under the appropriate standard. This court has said that under Reynolds, this is, you know, liberty is at stake. So it is the government's burden to show harmlessness. Let's go to the harmless beyond a reasonable doubt point. My friend here points out, kind of gave two elements to the harmless beyond a reasonable doubt standard. Direct appeal, constitutional error. Left out the next two parts, though. This is from Brown v. Davenport. Direct appeal, that a constitutional error occurred at his trial, and his conviction cannot stand. As far as I know, the Supreme Court has applied the harmless beyond a reasonable doubt standard solely to criminal proceedings, maybe even only criminal trials. This is a criminal proceeding, isn't it? It is most certainly not, Your Honor. One of the reasons for the laxer katiakos bracket standard is finality. When you're revisiting an earlier conviction here, we're on direct review of the proceeding that deprives him of liberty. But not a criminal proceeding. This court said it matters. It is nominally not criminal, but it is functionally criminal. Well, Your Honor, the Supreme Court... Going to jail, isn't he, Mr. Romano? That's not much more criminal than that. Well, Your Honor, collateral attacks, a person's in jail. We don't apply the harmless beyond a reasonable doubt standard. But there's a different finality, and there's also federalism, but definitely finality in that. Well, Your Honor, most courts have said... This court, I don't think, has spoken on it, but most courts have said even 2255s are subject to the Brecht standard. But regardless, this is from the Supreme Court, Morrissey, quote, no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. You don't have a constitutional right to an attorney. You don't have a jury. You have a judge. You have a preponderance standard, not a beyond a reasonable doubt standard. And as the government point out, this is page 22 of the brief... Let me make sure I understand. There's no right to counsel at a supervised release violation? I believe it's a statutory right. This is Gagnon v. Scarpelli. The Supreme Court said that there's a right to counsel in some cases. It's kind of a case-by-case basis. And the Congress has said, you've got a right. Sure. Not a constitutional right. But is that just because they were feeling really generous that day, or is that because supervised release revocation hearings often do result in people going to jail? Sure, Your Honor. But that happens in parole revocations, too. Look, the government pointed out, page 22 of its brief, pointed to a slew of cases in the non-criminal context, including parole revocations, where courts have applied the normal harmlessness standard. The reply brief doesn't say anything about that. Just one or two. No harmlessness. You're saying Brecht. You're not arguing for a clear error standard. For harmlessness, I'm arguing for, you know, 2111, Kodiakus, Brecht, whatever that standard is. But not the civil, clear error standard. But it's, you know, harmless does not affect substantial rights type of thing. You know, Kodiakus type of standard. And the only difference, of course, this Court said in Cross, is there's no need to disprove every reasonable possibility of prejudice. So that's the difference. How can you even satisfy that? Your Honor, first of all, even on the harmless beyond a reasonable doubt, and I pointed this out in my piece of paper here, but as his reply brief on page 221, he seems to almost say it's a structural error. It's not. We know it's not. This Court has the Leo opinion, the Seventh Circuit has Ortega opinion. It can be. How do you satisfy either Brecht or Chapman here? Well, Your Honor, first of all, Judge Kugler gave him much leeway in prosecuting this defense. I mean, he brought up documents that were... I know. And Judge Kugler said, and I'm not going to pay attention to this stuff, like, you had your chance. That's it. No, he... He kept brushing him off. He cross-examined the probation officer with all sorts of documents. He was... The probation officer was up there for days and days and days. No. That's not what this issue's about. Nobody's... I don't think even the other side is saying that Judge Kugler wasn't... was ignoring the evidence that was coming in during the time that the probation officer was on the stand. So, Your Honor, that's part of... The question that's been put to us and put to us very pointedly is, this man said, I want to speak in my own defense. Can I take the stand? And Judge Kugler said, no. You had your chance. But when we read the transcript, where... You tell us in the transcript where the exchange actually happens where Mr. Barksdale says, yeah, I don't want to take the stand. Because if you can point us to it, please do. Because all we have is just the opposite on pages 272 and 273. Let me get to that. I'll get to that first. But I do want to go back to the harmlessness point at some point. If we go through the transcript, first of all, let's start with the overarching... I have two responses to this. Overarching issue is, number one, what this Court has said in Long, and which I think is common sense. Time out. Let's get the facts straight first. What was in the transcript on 272, 273, the counsel had said at one point, he's not going to testify, and the client says, no, sir, I prefer to testify. Right there. And then they go off for about 10, 15 minutes to try to work out a deal. Because clearly what he's trying to do is get less time. And they come back and they said, we don't have a deal. And then the judge says, well, you said you didn't want to testify. That's the problem. He did say he wanted to testify. Well, I think you're skipping over some things, Your Honor. So counsel says he doesn't want to testify. Great. Barth still gets up. Immediately corrected by his client. Immediately corrected. Don't leave that part out. Well, first of all, Your Honor, I don't know that it's immediately corrected. Because what is missing... Well, it's lying in the transcript. Your Honor, he says, I prefer to testify. What's missing from this? Wait a second. Are you really hanging your hat on prefer? He says, I want to testify. I'll get to that in a second. But if we look at the legate opinion, where the defendant all but said, I want to get on that stand. And the defense counsel says, well, if he gets on that stand, I'm not going to ask him anything but his name. Right? This all happens with the judge there. Right? There could be no more badgering or threatening of the defendant not to testify than that. The very next day, the district court calls up the defense counsel at sidebar and says, do you have any more witnesses? And the defense counsel says, no. And the district court says, great. I'm glad you did that at sidebar. Because I didn't want that guy to stand up and say he wanted to testify. And this court said there was nothing wrong with that. That that was enough. The defense counsel saying, you don't want to testify, is what the district court should be relying on. And only if there's evidence... Wait, wait, wait, wait, wait. Look, in that case, for better or worse, there was no immediate and consistent assertion of the right. We've got a transcript to deal with. That's why the very first questions I was given, Ms. Brunson, were, show us in the transcript. Now it's being put to you, and we're still waiting for you to show us in the transcript, Mr. Romano, where he ever says, I don't want to testify. I don't think that you're going to find that, Your Honor. But what I think you're going to find... No, no, no. So this transcript might be corrupt. And we know that there are some off-the-record discussions and things. But don't we have to hold that against the government? I mean, I think maybe more needed to be transcribed. Maybe there was a little laxity here. But we have to rule based on what's here on the page, don't we? Well, Your Honor, I think... Okay. I've been trying to say this for a while, but I think it's true. I think we need to give Judge Kugler a little bit of deference. Because the way that the defendant is reading this transcript is literally the defendant saying, I want to testify. And Judge Kugler responding, great, you don't want to testify. I think that's remarkably... You always give the judge a little bit of deference. But when you got this transcript, what do we do? Let me go through it now. You've been asking, let me go through it now. Page 273, he says, I prefer to testify. He then starts complaining about counsel. Doesn't like counsel, didn't spend enough time on discovery, etc. Page 275, Judge Kugler says, okay, you know you're going to be subject to cross, right? Defendant says, I understand. Page 275, Judge Kugler, I find you made your choice. You don't want to testify. Okay. We don't know exactly where that came from except Judge Kugler is relying on defense counsel at this point. What does the defendant say? How do we know that? Why do you say we know he's relying on defense counsel at that point? Well, we assume he is. He doesn't say... Yeah. But what is... Stop assuming, Mr. Romano. Give us what's in the transcript. What happens... This is what I'm getting to here, Robert. He says, you don't want to testify. You understand. What does the defendant say? Yes, sir. My question is... What is his question? Is his question, how come I can't testify? Is his question, this guy won't let me testify? Is his question, how come you're not letting me testify? No. His question is, my question is, if defense counsel didn't spend a significant amount of time going over discovery, what are my options? Doesn't say anything about testifying. Yeah. Judge Kugler allows them to go back. Look, we have read the transcript and that's why you're getting and she got these questions because maybe a careful read, something slipped by. I understand, we all understand that there was a discussion where he was unhappy with counsel, where he said, I'd like to represent myself. I don't think he did enough. And his lawyer gets up and says, look, that's just not... He wanted to make a deal and it didn't happen. But get us to the point where you can show us, no, no, he really did. He himself said, or he wavered in what he said. He was equivocating about whether he wanted to testify. That's what seems to be missing here. It seems that what's on the record is him repeatedly saying, I want to take the stand. I have... This is my liberty at stake. I want to take the stand. Your Honor, I think... Can you point us to something that he says that's different than that? Well, your Honor, again, at the first day, at day two, Judge Kugler just keeps coming... Things keep coming up with counsel, with going pro se, et cetera, et cetera. I would point out the defendant never says at any of those points, you know what? The reason I'm changing my lawyer is I really want to testify. The reason I want to go pro se is because I really want to testify. Then we look at the next day, at sentencing, where he gives this really long allocution, right? And Judge Kugler says, you know what? You could have testified. What does he say then? He says, but first I said I did, and then he said the best interest was not to testify because I might do the wrong thing. Again, confirming what Judge Kugler has already found. No, no, no. Time out, time out, time out. He still never once said that he didn't want to testify after he said on 273... He didn't say, I changed my mind, okay. So you cited some precedents where the defendant stayed silent. But I think this is in your basket because he says no, sir. So then when does he retract? What here can be interpreted as a retraction? Your Honor, I just think that Your Honors aren't giving any deference whatsoever to Judge Kugler, who is in the courtroom with this defendant. I have the deference to the transcript. But Your Honor, Judge Kugler was in the courtroom. It makes no sense for the defendant to have said... The transcript. That's what was said in the courtroom. But Your Honor, we have to take into account that Judge Kugler is sitting there... There are things that a judge can do. If the judge is there and says, I want to reflect for the record that the defendant shrugged his shoulders, or shook his head, or gestured... Or nodded that he agreed. He didn't... There are ways to deal with nonverbal things. We don't have any of that here. What are we supposed to do? We can't say the harmless error standard can be overcome simply because Judge Kugler is a really good judge, who is well respected, who merits a measure of deference. Which all those things are true. Again, I think that's a different issue, Your Honor. You're asking about harmlessness. I'm talking about the first stage here. About whether there's an error. Did Judge Kugler... Was there an error here? How is it that we can say that no judge is error-free? I'm not. Judge Jordan isn't. Judge Amber isn't. Wait a second. Judge Jordan, you sat on the district court for a long time. Judge Peeves, I know you've been sitting on the district court a lot lately. Judge Kugler was in his courtroom. And I'm sure I need to be reversed once in a while. I just want to point out, again, I know I'm losing this point, but I just want to point out that it comes up over and over, and never does a defendant say, no, put me on that stand because this guy's lying, he said I didn't want to testify, and I do. I think, Judge Romano, you hit the most important point when you said, I think I'm losing this point. You should take the time you have, Your Honor.  Let's go to harmlessness, Your Honor. The reason, Your Honor, I pointed out why, you know, that Judge Kugler allowed so much cross-examination of the probation officer, is that is a consideration in harmlessness. That's what happened in Ortega v. O'Leary. That's what happens in Leo. What other evidence is there? So that's number one. He let this guy get away with anything. I mean, he was proffering documents that very day. He was proffering fraudulent documents. So he got his story out there, number one. Number two, the very next day, as you pointed out, he talked for 25-plus pages of transcripts. What do we make of Judge Kugler's statements to him that you had your chance, it's very convenient for you to tell me this story now, but you're not subject to cross-examination now. I'm really not paying attention to that. That's not what Judge Kugler said at all. What Judge Kugler said was, you're telling me you want me to ask you questions. Go ahead and ask me questions. And Judge Kugler was saying, well, that's convenient. If you really wanted to be subject to questioning, you could have taken the stand the day before. There's no evidence whatsoever that Judge Kugler wasn't listening to what he was saying. In fact, he was talking about the very things he said. He said, oh, you mentioned this e-mail, and you say it's not yours. I'm not buying it. You talked about this. I'm not buying it. So Judge Kugler was hearing all of this. And again, the very next day. What really happened is that all of us would be in this position with this individual could, you know, it was a difficult case. And he got frustrated. And we all would get frustrated. And the question is, he said he wanted to testify. And the judge perhaps forgot that he had earlier said that before the intermission to try to work out a deal on the side that didn't happen. And that's what we got. I don't think that's fair reading. That's going to be before that happens. Tell me, let's go back to Judge Bibas's question. Where did he rescind the statement that he wished to testify? I'm not saying that, Your Honor. But what I'm saying is Judge Kugler didn't forget anything. On page 275, he says, you don't want to testify. I'm merely guessing because, but you can see how somebody could get frustrated if you were a jurist in this position. Well, Your Honor, I think the defendant was playing games here a little bit. And I think that Judge Kugler again. My question is, do you disagree that a judge could get frustrated in this position? No, of course not, Your Honor. Okay, well then, just, that's the answer. Of course. Can I do one more thing on harmlessness, Your Honor? Sure. Okay. So, 25 plus pages, the defendant now says, oh, well, you don't know what I really would have said. I think that that's, you know, he has a smoking gun now that he's not telling anybody about. He talked about all these violations. He gave in-depth discussions about them. And Judge Kugler wasn't swayed because there's nothing he could have said about many of these. He didn't pay the restitution. He didn't, he lied to the probation officer. It's a matter that he said, I can't talk about the two, as Ms. Brunson put it, the two real, big, significant ones. Well, so what would he have said on direct? Well, that's what I'm asking you. Does that matter? Should that matter in our analysis? Well, sure. Again, if he really had the smoking gun here, what would he have told us by now? I mean, and the other thing, Your Honor, he told us that he had good defenses to the trial coming up with respect to the 2019 arrest. Well, what he said is, I would take the fifth, in essence. He said, I can't speak to that. I don't think he would. Should that matter in a harmlessness? Sure, because he would not have added anything. His testimony would have added nothing to this. And, Your Honor, one last point. This is on page, let's see, his reply brief, page 19. He says, you know, the government's argument is illogical because the judge had already revoked Mr. Barksdale's supervised release the day before the sentencing hearing. That didn't happen. The judge found he had committed the violations on day two. Day three, he hears the entire allocution before he finally revoked supervised release. Remember, revocation of supervised release is discretionary in this case. He didn't have to. If Mr. Barksdale said something interesting, Judge Kugler could have said, you know what, I'm not going to revoke your supervised release. And then there would be nothing to appeal. So that only happens after he hears from the defendant at length. All right. But, Your Honor, before I sit down, one public service announcement, just so you guys know. Barksdale, I think, is set to be released in July. There's no further supervised release. As far as I know, that means the case will be moot at that point. I just wanted Your Honors to know that that's where we stand. That's helpful. Thank you, Mr. Romano. Your Honor, I just have a few comments. And first... Do you have anything to add? Well, first, I did come up with a scenario as to when it would be harmless. And that would be precisely if a supervised release revocation was based upon other criminal conduct, the defendant was not permitted to testify in violation of constitutional rights. And then the defendant subsequently was convicted or pled guilty to those charges. That would be harmless error. If the supervised release revocation was based only solely upon, or primarily even, if that's what drove the sentence that was imposed or the revocation. I believe that would constitute harmless error. So there could never be a circumstance where being denied the opportunity to be on the stand with the same charges being the charges at issue in the supervised release. That could never be harmless. That's... I mean, you own it if that's your position. That's fine. I believe under these circumstances it is not harmless error. And I understand the question... I think these circumstances are not all that favorable for you in that And then he got... He got... He went on at, I'll repeat, extraordinary length and in allocution. So he really did get his story out there. But let me ask you the question about his assertion of the fifth. You heard me ask Mr. Romano about that. Should that play into this at all? If it's in fact the case that he was saying, look, as you put it, there are these technical violations, maybe not the big deals, but then there are these two significant state criminal charges that I'm facing. I can't speak to that at all. Does that mean, like, if he couldn't speak to it all, and he was right up front saying, I wouldn't be able to speak to it all, should that matter when we think, well, it's, you know... He wouldn't have said anything, so it is harmless. As to the two most significant things, he's forthright in saying, I'm not talking about that. I can't talk about that. Excuse me. Well, he didn't assert his Fifth Amendment right. He said he would. He didn't utter the words Fifth Amendment, but he did say, I'm facing charges and won't speak about that. So I don't know how to interpret that, except that a man who's no stranger to the criminal system at that, I think... I'm so sorry. Oh, that's okay. We'll give you the extra time you need. You want to grab a cough drop, too? I appreciate your indulgence. Again, there were a number of violations, and there were also one of the judges' rationales for the sentence imposed, which was significantly over the guideline range. The applicable guideline range was, I believe, a maximum of ten months. Not the statutory maximum, but the advisory one. Right. Was his repeated refusal, in the judge's mind, to abide by conditions, which included all of those. So I don't think that carries the day, simply that there were the criminal charges and that he said he couldn't testify to those.  In that case, the court applied in a habeas context. And I apologize, because I did incorrectly cite that as a Third Circuit case at some point. And it's clearly a Seventh Circuit case, not the Third Circuit case. It was a typographical error. But in Ortega v. O'Leary, the Seventh Circuit stated that, even though it was applying the harmless beyond a reasonable doubt standard, it was doing so through the lens of habeas review. And if they had come up on direct appeal, there might have been a very different outcome that's stated in the Seventh Circuit's decision. In addition to that, Leggett, which Mr. Romano mentions, is factually distinguishable because of Mr. Barstow's repeated verbal assertions. And in addition, I would point out Judge McKee's dissent in that case, where, of course, the panel ruled the day, but Judge McKee was very clear in his belief that the violation had been made.